**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 14 2000

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DAVID T. STANLEY                                                   PLAINTIFF

v.          Case No. 4-00 CV00297 HW

AMERICAN AIRLINES, INC.                                            DEFENDANT

**COMPLAINT**   This case assigned to District Judge __WOOD__
and to Magistrate Judge __CAVANEA__

COMES NOW Plaintiff David T. Stanley and for his cause of action against American Airlines, Inc., Defendant, does hereby allege and state:

## I.
## PARTIES, JURISDICTION, VENUE AND GENERAL ALLEGATIONS

1. This Complaint is for damages arising from the injury of David T. Stanley, a passenger on American Airlines' June 1, 1999 Flight 1420 from Dallas to Little Rock. Mr. Stanley is a citizen and resident of Arkadelphia, Arkansas.

2. Defendant American Airlines ("AA" or "American") is a corporation existing under the laws of the State of Delaware, with its principal place of business in Tarrant County, Texas. At all relevant times, American was doing business in the State of Arkansas. American maintains property and conducts regularly-scheduled flights to and from Little Rock National Airport in Pulaski County, Arkansas. It has sufficient commercial contacts with the State of Arkansas and its citizens to be subject to the jurisdiction of this Court. Pursuant to the Arkansas Long Arm Statute, Ark. Code Ann. § 16-4-101, jurisdiction is proper because this cause of action arose directly from American



Airlines' acts/omissions committed in this State and because American Airlines has continuing and systematic contacts within this State.

3. Service of process may be accomplished upon American Airlines through The Corporation Trust Company, 417 Spring Street, Little Rock, Arkansas 72201.

4. The amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs. The United States District Court for the Eastern District of Arkansas has jurisdiction of this cause of action pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship.

5. In this complaint, the Plaintiff claims damages under a treaty of the United States, the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Signed at Warsaw on October 12, 1929, 49 Stat., Part II, p. 3000, 2 Bevans 983, 137 L.N.T.S. 11, which is commonly known as the "Warsaw Convention." Therefore, there also exists in this matter federal question jurisdiction pursuant to 28 U.S.C. Section 1331.

6. Pursuant to 28 U.S.C. § 1391(a), the United States District Court for the Eastern District of Arkansas, Western Division, is the proper venue for this matter because a substantial part of the events or omissions giving rise to this claim occurred in this district, as did the wilful, wanton, reckless, negligent and otherwise wrongful acts and omissions of Defendant, which were the proximate cause both of the incident and of the damages complained of herein.

7. At all times relevant to this cause of action, American Airlines was a "common carrier" as that term is defined by law. On June 1, 1999, David Stanley was a passenger on American Airlines Flight 1420 from Dallas/Fort Worth, Texas to Little Rock, Arkansas. Mr. Stanley held a duly purchased ticket and was accorded all rights and privileges appurtenant thereto.

## II.

## **FACTUAL ALLEGATIONS**

**David Stanley**

8. On June 1, 1999, David Stanley was a healthy, outgoing and accomplished young man whose future held great promise. He had graduated valedictorian of his high school class and continued to excel at Ouachita Baptist University where his name appeared without exception, every semester, on the University President's List. David was active in his community and was a talented vocalist, having received a number of awards in state and regional competitions. That evening, he and a number of his classmates and friends, all members of the Ouachita Baptist University Singers, were returning home upon the conclusion of a successful, three-week tour of Austria and Germany where they had performed, served as witnesses to their faith and visited Kosovar refugees. On the evening of June 1, 1999, David Stanley was looking forward to a safe return home, resuming his studies and planning for his future.

9. Instead -- through no fault of his own, through no choice of his own -- the course of David Stanley's life was irrevocably changed. The crew at the helm of American Airlines Flight 1420 would make decisions that evening having a profound and devastating effect upon virtually every aspect of his life. The complete, total and incomprehensible disregard for the value of human life displayed both by the crew of Flight 1420 and by the larger corporate entity of which they were a part, has left an indelible mark upon David Stanley.

10. David was seated in Aisle 21, Seat A, on the left side of the plane, immediately over the wing. His seat was designated an "emergency exit." Prior to take off, members of the flight crew commented to David that they were tired.

11. The approach to Little Rock through wind, lightening, rain and hail, was turbulent. David could see rain pouring horizontally against the wing. He sensed the plane was moving extremely fast to be so low to the ground. He became anxious. Upon landing, he breathed a sigh of relief, glad to be delivered safely home. Relief quickly turned to terror, however, as he realized the plane was not stopping.

12. Upon impact, David found himself confronted with fire, acrid smoke and the screams of his fellow passengers. He struggled to open the emergency door by his seat. Another passenger assisted. The door finally opened, but there was no way to exit because the wing had been torn away from the plane. A wall of fire approached as David frantically searched for another means of escape. Ultimately, passengers seated only two, three and four rows directly in front David would perish in that fire – a fact upon which David often reflects.

13. For a terrifying and seemingly interminable period of time, David saw no way out of the wreckage. He was trapped and terrified of dying.

14. David did make his way out before the flames reached him, with the help of Dr. Fuller, his choir director. David escaped, however, only to find himself surrounded by yet another source of terror: fierce lightening, wind, rain and hail. He also emerged to the sight of one of his best friends, severely injured. David proceeded to attempt to comfort his friend and to shield her from the elements during the long wait for help. The images of the approaching fire and of his severely injured friend, and the emotions associated with those images, have left indelible marks upon David Stanley's mind and memory.

15. Only after a long interval did emergency personnel arrive. Throughout the evening of June 1, 1999, during the flight, landing, crash, escape and wait, David was made to confront overwhelming fear, terror, utter helplessness and prolonged, extreme anxiety.

16. In the accident, David sustained cuts, bruises, internal soreness, persistent poison ivy and other injuries. Following the accident, he suffered sleeplessness, crying spells, nightmares, flashbacks, and panic attacks. Terrifying flashbacks occur at unexpected moments, brought on by something as simple as a smell, or a picture on television. He has felt alienated from traditional sources of comfort and is having difficulty finding the joy and happiness in life he previously experienced.

17. Months after the accident, David continues to suffer from the physical injuries and the manifestations of the physical injuries he sustained at the hands of American Airlines. Always a straight A student, he now is experiencing difficulties in school. His health and the course of his future have been irrevocably altered.

18. The knowledge that his suffering and that of his friends could have been avoided had American simply observed the duty of care it owed to him and to the rest of the passengers aboard Flight 1420 that evening adds to the weight of the burden he bears.

**American Airlines' Operation of Flight 1420**

18. On June 1, 1999, Richard Buschmann commanded American Airlines Flight 1420. Michael Origel sat as co-pilot. Flight 1420 departed the Dallas/Fort Worth Airport for Little Rock National Airport at 2240 Central Daylight Time ("CDT") -- two hours and twelve minutes after scheduled departure time, and with the crew aware of the deteriorating weather conditions along their flight path and in the Little Rock area.

19. American Airlines keeps a "Shame List" on which certain late flights and crews are identified. As American Airlines pilots, Buschmann and Origel knew this.

20. Prior to departure, Captain Buschmann told a flight attendant he was tired. At 2324:08 CDT, an audible yawn was heard on the cockpit area microphone. Other crew members complained of being tired, as well.

21. American Airlines had a practice of interviewing or questioning flight crew who deemed themselves too fatigued to fly. Buschmann and Origel knew this. Since the crash of Flight 1420, American Airlines has changed this practice or policy. Fatigued pilots may now take themselves off of a flight without undergoing questioning from management about that decision.

22. While still on the ground, Buschmann and Origel watched on radar the weather into which they would be flying. They were aware of the deteriorating weather conditions. At the Dallas/Fort Worth Airport, the flight crew received departure paperwork for the flight that included airplane information, weight and balance information, and weather information. The weather information contained a SIGMEC ("Significant Meteorological Conditions") report indicating a line of thunderstorms along the planned flight path to Little Rock. A SIGMEC is a weather advisory issued by American Airlines identifying weather that could have some influence on the safety of flight operations.

23. At all relevant times, the crew of Flight 1420 knew that it was unsafe to attempt to land or take off with a thunderstorm on the intended flight path and that to do so meant to risk the aircraft and the lives of its passengers.

24. Following takeoff, at 2254 CDT, the crew of Flight 1420 received an ACARS ("Aircraft Communications Addressing Reporting System") message from American Airlines advising

them of en route weather and of the weather in the Little Rock area. The message indicated that weather could be a factor in arrival at Little Rock and that the crew should try to beat the storms. The flight crew acknowledged receipt of the message.

25.     In fact, the thunderstorms near and around the Little Rock Airport that evening were classified by the National Weather Service as "Class 6" storms. "Class 6" is the most severe rating given to thunderstorms.

26.     At 2258 CDT, the National Weather Service issued a revised Terminal Area Forecast for Little Rock, which called for visibility reduced to one mile in thunderstorms and heavy rain.

27.     Flight 1420 turned turbulent shortly after it left the Dallas/Fort Worth Airport.

28.     According to the NTSB transcript of the cockpit voice recorder, at 2325:13 CDT, Origel flippantly referred to the storm cells in the area, saying to Buschmann, "There's your big wadiddily." Buschmann replied, "Yeah," and a few moments later said, "We got to get over there quick." Origel, apparently looking out the window, said to Buschmann, "I don't like that ... that's lightening." Buschmann agreed, "Sure is."

29.     The passengers, including David Stanley, were acutely aware of the turbulent conditions as they watched the lightening flash outside their windows.

30.     Over the public address system, Buschmann said to the passengers, "...quite a light show off the left side of the plane. We'll be passing that on our way to Little Rock. ... we should be landing here in about uh, twenty minutes. ..." (2327:27 CDT) To Origel, however, Buschmann said, "We gotta get there quick."

31. An approach brief, as required by American Airlines Flight Manual, Part 1, Section 10, or American Airlines DC9 Operating Manual, Volume 1, NORMALS section, page 87, was not performed.

32. At 2328:40 CDT, Flight 1420 began a descent to 10,000 feet. The cockpit crew set the $V_{ref}$ or "bug" airspeeds, for a maximum allowable aircraft landing weight of 130,000 pounds, as opposed to the actual or predicted aircraft landing weight.

33. At 2334:09 CDT, air traffic control advised the cockpit crew of Flight 1420 that there was a thunderstorm northwest of the airport "moving through the area now." At 2339:44 CDT, air traffic control advised the cockpit crew of a wind shear alert. Origel has said that when the controller reported the winds, he thought about the crosswind limitations and took out the Operating Manual to check the wind limitations. Buschmann had no interest in the limitations, however, recklessly proceeded without reference to the Manual or to Origel and, in fact, indicated for Origel to put the Manual away. Rather than persist, Origel put the Manual away and, without checking it, said, "aw, what the [expletive]."

34. Since the crash of Flight 1420, American Airlines has changed its thunderstorm avoidance and crosswind procedures and is providing its first officers "assertiveness training," emphasizing the expectation and need for them to speak up during the course of a flight. American's Flight Manual, paragraph 1.6 ("Flight Crew member Responsibility to Offer Advice"), now provides in part: "Any cockpit crew member who believes the aircraft is being handled improperly or placed in jeopardy, will immediately inform the Captain. The Captain may choose to disregard this advice, but regardless of the degree or frequency with which advice may go unheeded, cockpit crew members will be held responsible for continuing to offer advice for the Captain's consideration."

35. The American Airlines DC9 Operating Manual provides that when positive indications of severe wind shear exist, the affected area is to be avoided by diverting, initiating a go-around, or holding until conditions improve. While Flight 1420 was making an approach to Runway 4R, the controller made two reports of dangerous wind shear; yet, Flight 1420 failed to take any of these three required measures.

36. Between takeoff and the attempted landing, neither Buschmann nor Origel discussed or recommended diversion to an alternate destination. American discourages diversions (landings at alternate sites) because they cost American money in the form of travel vouchers, lodging costs, and schedule changes and delays. American Airlines tracks and trends flight diversions. As American Airlines pilots, Buschmann and Origel knew this.

37. At 2342:26 CDT, air traffic control advised Buschmann and Origel that the "second part of this thunderstorm is moving through."

38. At 2342:54 CDT, Origel, referring to the storm, said, " [Expletive] ... it's going right over the f- field."

39. Despite the dangerous weather, American Airlines pilots Buschmann and Origel continued Flight 1420's final descent into Little Rock amid flashes of lightening, bursts of thunder and powerful gusts of wind. Balls of hail pummeled the craft and bounced off its wings, as it pitched, rolled and skidded through the air.

40. In the cockpit, Buschmann and Origel played a dangerous game of hide-and-go-seek with the runway through the weather. The cockpit voice recorder reflects both men losing and then finding, then losing again, visual contact with the airport and runway.

41. At 2343:11 CDT, Flight 1420 was cleared for a visual approach to Runway 4R.

42. At 2343:59 CDT, Flight 1420 was cleared to land and was advised that winds were from 330 degrees to 21 knots.

43. At 2344:19 CDT, Buschmann said, "I don't think we can maintain the visual."

44. At 2344:30 CDT, Origel radioed the control tower, saying "... there's a cloud between us and the airport. We just lost the field. ..." At 2344:45 CDT, air traffic control provided Flight 1420 with a heading to intercept the ILS (instrument landings systems) approach to Runway 4R.

45. Buschmann and Origel did not conduct the ILS Runway 4R approach brief as required by the AA flight and operation manuals. They did not use the Cat. 1 ILS crew-coordinated approach procedures as required by AA DC9 Operations Manual Volume 1, NORMALS, page 101-102.

46. At 2345:15 CDT, Buschmann said, "I hate droning around visual at night in weather without having some clue where I am." At 2345:29 CDT, Origel stated, "See how we're going right into this crap." At 2346:11 CDT, Origel is heard to say, "See we're right on the base of these clouds so...." Buschmann replies, "Yeah," and Origel continues, "...it's not worth it."

47. Despite the clear and present danger to the lives and safety of the passengers aboard Flight 1420, as evidenced by these conversations, the pilot continued in his disregard of said danger and made no effort whatsoever to abort his landing approach or in any way otherwise avoid the danger to the lives and safety of the passengers of Flight 1420.

48. At 2346:39 CDT, air traffic control cleared Flight 1420 for an ILS approach to Runway 4R. At 2346:52 CDT, Flight 1420 was advised of heavy rain and of visibility of less than one mile. They also were advised that the minimum RVR, or "runway visual range," for Runway 4R was 3,000 feet. The flight crew acknowledged the report.

49.	At 2346:52 CDT, Buschmann stated, "Aw, we're goin' right into this."

50.	At 2347:08 CDT, air traffic control advised Flight 1420 that it was cleared to land and winds were from 350 degrees at 30 knots, gusting to 45 knots. At 2348:13 CDT, air traffic control advised Flight 1420 that the runway visual range was down to 1,600 feet. The Runway 4R approach minimums were 2,400 feet runway visual range.

51.	At 2347:53 CDT, the controller issued a second wind shear alert for the airport. He reported the winds as follows: centerfield wind 350 degrees at 32 knots with gusts to 45 knots, north boundary wind 310 degrees at 29 knots, and northeast boundary wind at 320 degrees at 32 knots. Moments later, Buschmann stated, "This is a can of worms."

52.	At 2348:27 CDT, air traffic control advised Flight 1420 that winds were 340 degrees at 31 knots. The crosswind limit for landing with less than 4,000 feet runway visual range was 15 knots, and for a visual range of less than 1,800 feet, 10 knots. The crosswind limit for a wet runway was 20 knots.

53.	Despite the crew's knowledge that the visual range and crosswinds were well outside of the allowable limits for the approach, the flight crew continued its approach with total disregard for the safety of the passengers of Flight 1420.

54.	The AA 1420 flight crew failed to perform the landing check list as required by AA DC9 Operations Manual, Volume 1, NORMALS section, page 71.

55.	The aircraft's landing spoilers did not deploy during landing. Buschmann did not monitor and manually deploy the landing spoilers as he was required to do under the AA flight policy, nor did Origel monitor and manually deploy the spoilers.

56. At 2349:57.5 CDT, with the aircraft less than 25 seconds from ground contact, either Buschmann or Origel, exclaimed, "Aw [expletive], we're off course." Origel then called for a "go-around" and again exclaimed, "We're way off." Buschmann says, "I can't see it [the runway]," but nonetheless ignores the co-pilot's call for a go-around and continues his descent.

57. At 2350:06.1 CDT, with the aircraft less than 150 feet above the ground, Buschmann sees the runway for the first time and says, "Yeah, I got it." At that point, the aircraft was too high (by more than 3 dots as it crossed the runway threshold) above the runway, not properly lined up on the runway or otherwise in position to safely land, was attempting to do so on a wet runway, in a known crosswind that was well beyond the allowable limits of the aircraft, with the landing procedures having not been performed, and without the spoilers that stop the aircraft having been deployed, in the midst of a Class 6 thunderstorm, all of which was done with a total and conscious disregard for the lives and safety of the passengers. The aircraft's left main landing gear did not touch down until only 5,228 feet of runway remained. The right main landing gear did not touch down until only 4,303 feet remained. At that point the aircraft was out of control.

58. Almost immediately upon landing, at 2350:25.4 CDT, Origel is heard to say, "We're sliding." The plane was in fact sliding out of control across the hail slickened, wet runway. Origel has since told the NTSB that the landing was "violent," that he did not feel "the normal landing sensations where you felt the brakes, spoilers and reverse," and that the sensation felt like a "roller coaster."

59. Autobrakes were not used. The AA DC9 Operations Manual, Volume 1, ENVIRONMENTAL section, page 4 states: "On short or slippery runways, wheel braking may be least effective at the end of the runway because of rubber deposits, snow, or ice. In these conditions,

since the middle of the runway offers the best friction for wheel braking, brakes should be aggressively applied by the use of MAX autobrakes or manual braking immediately after touch down." The flight crew did not utilize the aircraft's auto braking system, however. Neither crew member, in fact, even applied the aircraft brakes until approximately eleven seconds had elapsed after touch down on what remained of the wet runway.

60. Despite a wet runway and gusting crosswinds, Buschmann significantly exceeded the EPR, or engine pressure ratio limits, for reverse thrust power on a wet runway, thereby further contributing to the already out of control aircraft situation. As it neared the end of the runway still out of control, the aircraft was still traveling at approximately 95 miles per hour. The aircraft failed to stop. It careened off the end of Runway 4R, through a chain link security fence, over an embankment, across a dirt road, into a field, and then, with tremendous force, it impacted a series of cement and metal approach light support structures, at which point the aircraft broke apart and burst into flames. The plane came to rest approximately 830 feet beyond the threshold of Runway 4R, just short of the rain-swollen Arkansas River. The plane was destroyed.

## The Wilful, Wanton, Reckless, Negligent and Otherwise Wrongful Acts and Omissions of the Defendant

61. American Airlines was operating Flight 1420 pursuant to authority conferred by the Federal Aviation Administration as a Part 121 air carrier. At all times relevant, American Airlines was operating Flight 1420 as a common carrier, having the duty to exercise that degree of care which a competent and prudent person would use for the safety of its passengers under the same or similar circumstances.

62. The crash of American Airlines Flight 1420, and the resulting injuries and damages complained of herein, were proximately caused by the wilful, wanton, reckless, and negligent acts and omissions of American Airlines and its employees, for whose conduct American is legally liable. These acts and omissions included, but were not limited to, the following:

    a.    attempting to land the aircraft in known severe thunderstorms, known wind shear and known extreme wind gusts well beyond the allowable landing limits of the aircraft, where a prudent airline pilot and crew would not have attempted to land in reckless, conscious, and wilful disregard for the safety of David Stanley and the other passengers on Flight 1420;

    b.    failing to have or to follow reasonable, prudent, and established procedures for determining when not to land an aircraft under inclement weather conditions;

    c.    permitting an aircraft to be operated by a fatigued crew who, at the time of the crash, were in danger of exceeding their maximum allowable duty time;

    d.    violating the provision of 14 C.F.R. § 91.13 prohibiting the careless and reckless operation of an aircraft, which constituted negligence *per se;*

    e.    failing to advise the passengers of and prepare the passengers for an emergency situation;

    f.    failing to follow established or otherwise reasonable and prudent emergency evacuation procedures;

    g.    ignoring numerous notifications from the Control Tower advising the flight crew of the hazardous weather conditions then present at Little Rock National Airport where a reasonable and prudent pilot would have aborted or otherwise avoided an approach in such conditions;

h. permitting Flight 1420 to depart Dallas when a prudent airline would have refused to do so;

i. instructing its flight crew (by communications from the American Airlines dispatcher) that despite the known hazardous weather conditions then existing at Little Rock National Airport, the flight crew should attempt to "beat" the weather;

j. failing to follow reasonable and prudent procedures and/or required procedures in the landing of the aircraft and failing to otherwise safely and properly land the aircraft, including but not limited to failing to monitor and deploy the spoilers, which are necessary for stopping the aircraft, failing to properly use the brakes, failing to use the autobrakes, and improperly using the engine thrusters; and

k. engaging in other such acts of negligence, wilful and wanton conduct and recklessness which may be revealed during the discovery process.

63. Each of the above acts or omissions, together with others, or a combination of them, constituted wilful and wanton misconduct, conduct recklessly pursued in conscious disregard of the safety of the passengers, negligence and negligence *per se*. The conduct of American Airlines, which proximately caused the crash of Flight 1420 and David Stanley's injuries, involved acts and omissions committed or omitted with such conscious indifference, and in such a wilful and wanton fashion, that malice may be inferred. Accordingly, Mr. Stanley is entitled to exemplary/punitive damages in an amount sufficient to punish American Airlines for its conduct and to deter it from similar wrongful conduct in the future.

64.     Further compounding and aggravating the emotional distress, grief and anguish David Stanley experiences daily is the knowledge that the crash of Flight 1420 was completely avoidable, yet, without excuse, occurred nonetheless.

65.     The doctrine of *res ipsa loquitur* applies to this occurrence and the resulting harm caused by the crash.

66.     The above acts and omissions were the proximate cause of the crash of Flight 1420 and the injuries suffered by Plaintiff.

67.     As a direct and proximate result of the foregoing, Plaintiff David Stanley is entitled to recover both compensatory and punitive damages in an amount to be established by the jury.

## III.
## DAMAGES

68.     Defendant, through its conduct and the conduct of its employees, caused Plaintiff's injuries. Damages include, but are not limited to, the following:

   a.    Scars, disfigurement and other physical injuries and manifestations of physical injuries, to include Post Traumatic Stress Disorder, which have been suffered to date and will in the future be suffered;

   b.    Costs of medical care, treatment and services received, including related, incidental and necessary expenses incurred in securing such care, treatment and services, as well as the present value of such expenses reasonably certain to be required in the future;

   c.    The value of working time, earnings, and educational time lost, and the present value of the same reasonably certain to be lost in the future;

   d.    The fair market value of property lost; and,

   e.  Other damages recoverable by law.

69. American Airlines' acts and omissions were committed wantonly and with such conscious indifference to the consequences that malice may be inferred. Plaintiff is entitled to exemplary damages in an amount bearing a reasonable relationship to the actual damages sustained.

WHEREFORE, Plaintiff prays for judgment against Defendant American Airlines, Inc. in an amount exceeding that required for federal diversity jurisdiction; for exemplary/punitive damages to punish and deter Defendant from this and similar future conduct; for pre-judgment interest, attorneys' fees, court costs; and all other just and proper relief to which Plaintiff is entitled. Plaintiff requests a trial by jury.

               Respectfully submitted,

               William H. Sutton, Arkansas Bar No. 59018
               Scott J. Lancaster, Arkansas Bar No. 85087
               FRIDAY, ELDREDGE & CLARK
               2000 Regions Center
               400 West Capitol
               Little Rock, Arkansas 72201
               Telephone: (501) 370-3322
               Facsimile: (501) 376-2147

By: _____

       ATTORNEYS FOR PLAINTIFF
       DAVID T. STANLEY